IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEGAN C.,[1]

        Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

Case No. 3:23-cv-00992-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

    Plaintiff Megan C. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title II Disability Insurance Benefits under the Social Security Act. All parties have consented to allow a Magistrate Judge enter final orders and judgement in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

---

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party or parties in this case. Where applicable, this opinion uses the same designation for a non-governmental party's immediate family member.

Page 1 – OPINION AND ORDER

## PROCEDURAL BACKGROUND

Born in March 1980, plaintiff alleges disability beginning September 1, 2016, due to myotonic muscular dystrophy and a "slight learning disability." Tr. 182, 228. On May 12, 2022, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, did a vocational expert ("VE"). Tr. 25-46. On May 19, 2022, the ALJ issued a decision finding plaintiff not disabled. Tr. 15-20. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-6.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff had not engaged in substantial gainful activity "during the period from her alleged onset date of September 1, 2016, through her date last insured of March 31, 2017." Tr. 17. At step two, the ALJ determined the following impairments were medically determinable: "myotonic muscular dystrophy, mild tachycardia, and obesity." *Id.* However, the ALJ found that these impairments were not "severe" during the adjudication period, such that the ALJ did not continue the sequential evaluation process. *Id.* In particular, the ALJ observed "the only medical evidence in the record dated prior to [plaintiff's] date last insured is an emergency department visit in July 2016 for an inflamed pilonidal cyst." Tr. 16.

## DISCUSSION

Plaintiff argues "[t]he ALJ erred by finding . . . myotonic muscular dystrophy not severe at Step Two as a result of improperly disregarding [her] testimony and by failing to develop the record." Pl.'s Opening Br. 3 (doc. 10). Plaintiff also challenges the ALJ's treatment of the lay witness testimony. According to plaintiff, the ALJ improperly disregarded all evidence surrounding the "level of lethargy she experienced" prior to the date last insured. *Id.* at 4.

Page 2 – OPINION AND ORDER

I.      **Plaintiff's Testimony**

Plaintiff first contends the ALJ erred by "completely overlook[ing] her testimony regarding excessive lethargy that undermined her ability to perform work previously." *Id.* at 3. When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness, and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2016 WL 1119029. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether the ALJ's rationale "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the hearing, the plaintiff testified she was unable to work prior to the March 2017 date last insured because she experienced "sleepiness on the job," "started falling more regularly," and

Page 3 – OPINION AND ORDER

could no longer climb stairs or lift heavy objects. Tr. 37-38. Plaintiff also indicated her "speech [was] affected sometimes." Tr. 37. She testified that she currently experienced "excessive daytime sleepiness," inadvertently napping for periods of 45 minutes to 2 hours. Tr. 39-40. Her symptoms worsened "about six months ago." Tr. 41.

After summarizing the hearing testimony, the ALJ determined that plaintiff's medically determinable impairments could have reasonably been expected to produce the alleged symptoms, but her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent for the reasons explained in this decision." Tr. 18. In particular, the ALJ cited the "the lack of documented treatment during the relevant Title II period, and [plaintiff's] self-report that she had not seen a primary care provider for years and was doing well," coupled with the unremarkable objective findings following the date last insured. Tr. 19.

An independent review of the record reveals that the only treatment obtained prior to the date last insured was for a pilonidal cyst on July 5, 2016 (which predated the alleged onset date). Tr. 507-09. During this appointment, the provider noted that plaintiff was "alert and [in] [n]o distress" but exhibiting mild anxiety. Tr. 508. There is no suggestion in the record that the cyst was related to plaintiff's muscular dystrophy or fatigue, and neither muscular dystrophy nor fatigue were mentioned or discussed at this appointment.

Plaintiff next sought treatment when she presented to the emergency department on July 17, 2017 – i.e., approximately four months after the date last insured – with moderate leg pain and gradual swelling, and shortness of breath. Tr. 369-70. Plaintiff was diagnosed with a pulmonary embolism. Tr. 374-75. Although her muscular dystrophy was noted within her emergency department records, there were no fatigue or sleepiness complaints associated with that condition. *See* Tr. 399 (attending physician reporting that plaintiff, "at baseline, has muscular dystrophy but

is quite functional, able to do all iADLs, and not bedbound. Does have trouble with standing for extended periods of time").

On August 2, 2017, plaintiff established care with nurse practitioner Brittney Griggs due to "sustaining [an] embolism [that] was blamed on birth control which she has subsequently discontinued." Tr. 333. At that time, plaintiff "state[d] that she is doing well" and "[h]asn't really had" a primary care provider for a "few year[s]." *Id.* As for chronic health problems, plaintiff reported she "has myotonic muscular dystrophy . . . [the] primary symptoms are fatigue and weakness; she has mild gastrointestinal symptoms as well." *Id.* Although muscular dystrophy continued to be listed as part of plaintiff's medical history in Ms. Griggs' notes thereafter, and the "review of systems" section documented muscle weakness and fatigue, there were no active complaints associated with those conditions.

Plaintiff had another appointment with Ms. Griggs on August 24, 2017, for treatment of "[r]ed spots on neck (noticed yesterday) not painful or itchy." Tr. 331. Plaintiff otherwise stated she was "feeling pretty well . . . she isn't having any breathing issues as much anymore." *Id.* During the PHQ-9 depression screening, plaintiff reported several days of "feeling tired or having little energy" and "trouble falling or staying asleep, or sleeping too much." *Id.* Based on these results plaintiff was denoted to have "Minimal Depression." *Id.*

On September 20, 2017, plaintiff presented to Ms. Griggs for a routine follow up. Tr. 329. Plaintiff noted "a little short[ness[ of breath" if "she doesn't use her oxygen [but] [o]therwise . . . she is doing well and has no acute complaints." *Id.*

On November 16, 2017, plaintiff again sought routine care with Ms. Griggs; she indicated "[h]er oxygen saturation has been holding pretty steady at 96-97% [and she] is not using her

oxygen at all at this point." Tr. 327. Plaintiff was "[o]therwise . . . doing well and had no acute complaints." *Id.*

On January 12, 2018, plaintiff obtained an updated CT scan in which the pulmonary emboli seen on her prior imaging was no longer present. Tr. 342-43. She returned on February 12, 2018, to follow up on her use of the anticoagulant originally prescribed for her pulmonary embolism. Tr. 325. Plaintiff "state[d] that overall she is doing well." *Id.*

On September 26, 2018, plaintiff went to Oregon Health Science University ("OHSU") for a new patient consultation. Tr. 367. Plaintiff reported muscular dystrophy as a historical diagnosis but did "not know much else about [her] medical history." *Id.* Her main concern at that time was "general hair loss." *Id.* There was no mention of fatigue recorded during this visit. Tr. 367-69.

On February 18, 2019, plaintiff went to OHSU complaining of a lesion in her genital area. Tr. 545-46. She returned on March 4, 2019, remarking that her lesion was "[i]mproved from [her] last visit." Tr. 540-42. On June 26, 2019, plaintiff sought care from OHSU for a rash on her arm, "wondering if this could be poison or oak"; she was told to use a medical cream. Tr. 537-39. On October 22, 2019, she again went to OHSU for the influenza vaccine and "uncomfortable stuffiness" in her ears for past three days. Tr. 532. Finally, on February 3, 2020, plaintiff went to OHSU for immunizations, disability paperwork, and toe pain. Tr. 526-31.

The ALJ reasonably inferred from this evidence that plaintiff's allegedly disabling impairments were not as limiting as alleged. Moreover, the Court notes that the medical record characterizes muscular dystrophy as a historical diagnoses, as opposed to a condition for which plaintiff was seeking active treatment during the adjudication period. *See* Tr. 527, 537, ("[m]yotonic muscular dystrophy @ age 10"); *see also* Tr. 370 ("[p]ast medical history: No date: Muscular dystrophy"), 375 (describing plaintiff as a "female with history of muscular dystrophy").

Page 6 – OPINION AND ORDER

In other words, all of plaintiff's past work coincided with her myotonic muscular dystrophy, and there is no evidence in the record before the Court that she experienced symptoms, including debilitating fatigue or daytime sleepiness, associated with this condition during the relevant time period. There is likewise no indication this condition worsened prior to the date last insured.

In sum, the ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptoms statements.

## II.     Lay Witness Testimony

Plaintiff next asserts the ALJ erred by discrediting the lay statements of her father-in-law, Charley C. "Lay testimony as to a claimant's symptoms is competent evidence that the [Commissioner] must take into account." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citation omitted); *see also* 20 C.F.R. § 404.1529(c)(1) ("[i]n evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you"). For initial applications filed after March 27, 2017, the ALJ is not "required to articulate how [they] considered evidence from nonmedical sources" using the same criteria required for the evaluation of medical sources. 20 C.F.R. § 404.1520c(d). The ALJ must nonetheless articulate their assessment of lay witness statements under the new regulations. *Tanya L.L. v. Comm'r Soc. Sec.*, 526 F.Supp.3d 858, 869 (D. Or. 2021).

On May 3, 2022, Charley C. wrote a letter in support of plaintiff's claim, stating in relevant part:

> I have been a caregiver to 5 dependents with Myotonic Muscular Dystrophy (DMl) for 54 years. Currently, one is in respite care, one is wheelchair bound, one walks with a cane and braces and two need canes and assistance. All are members of my family and all but one live with me in one household. We have all been members of a support group for DMl and witness to its degenerative impact from cradle-to-grave. This includes my daughter-in-law [who] married my son almost ten years

Page 7 – OPINION AND ORDER

> ago and has lived with us the whole time since. We interact with her daily. In that time, she has declined in health and vitality. Megan initially volunteered to general housekeeping, cooking, dishwashing, laundry, vacuuming, grocery shopping, etc. It quickly became clear that she would not be able to keep up with housework like she hoped. I remember her falling in Bi-Mart while shopping around 2015. In the last several years, she began falling in stores more often on her shopping trips. She developed painful episodes involving blood clots in her feet and legs. She was hospitalized in 2017 with a large saddle-embolism that left her lungs scarred plus she suffers from seasonal allergies. Normal walking and standing is limited to 2 or 3 minutes at a time. Chores have become selective . . .
>
> Typical symptoms of DMl are excessive daytime sleeping and "a curious apathy". The Sleeping masks mood swings and depression. The apathy results in clutter and piles resembling hoarding. Megan is inclined to avoid conflict. She handles her symptoms to keep them from being issues. She strongly dislikes verbal confrontations and will relocate to avoid arguments. Like many DM1 she recognizes the loss of strength, skills, and capacities. She says she often feels "anxiety". Megan has lost several aunts and uncle to DM1. She has a mother and a brother severely affected by the disease. Megan used to enjoy attending church and Bible Study often. Now she seldom gets out of the house. Megan is able to do her own personal care.

Tr. 316.

The ALJ "considered" the lay testimony but found it unpersuasive "like plaintiff's subjective allegations of disability" due to "the lack of substantive objective medical evidence generated during the relevant period." Tr. 20.

Here, as the ALJ denoted, the lay witness testimony is similar to plaintiff's testimony, insofar as it broadly describes problems functioning and worsening symptoms. Charlie C.'s statements, however, do not necessarily relate back to the adjudication period or even specifically pertain to plaintiff. And, as discussed in Section I, the ALJ provided clear and convincing reasons, supported by substantial evidence, for rejecting plaintiff's subjective symptom testimony and those reasons apply equally to Charlie C.'s statements. As such, the ALJ did not err in regard to the lay witness testimony.

## CONCLUSION

Page 8 – OPINION AND ORDER

For the reasons stated above, the Commissioner's decision is AFFIRMED, and this case is DISMISSED.

IT IS SO ORDERED.

DATED this 8th day of April, 2024.

        /s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

Page 9 – OPINION AND ORDER